# United States District Court

SOUTHERN **DISTRICT OF** FLORIDA

UNITED STATES OF AMERICA

V.

TROY BROWN, and
PAUL FERGUSON a/k/a "Pablo"

(Name and Address of Defendant)

**CRIMINAL COMPLAINT**

CASE NUMBER: 00-4153-SNOW  00-4153-SNOW

I, the undersigned complainant being duly sworn state the following is true and correct to the best of my knowledge and belief. On or about ___5/11/00 to 6/22/00___ in ___Broward___ county, in the ___Southern___ District of ___Florida___ defendant(s) did, (Track Statutory Language of Offense)

knowingly and intentionally combine, conspire, confederate, and agree with each other, and with persons known and unknown, to import into the United States from a place outside thereof, the Bahamas, a Schedule II controlled substance, that is a mixture and substance containing a detectable amount of cocaine; and did knowingly and intentionally import into the United States, from a place outside, the Bahamas, a Schedule II controlled substance, that is, a mixture and substance containing a detectable amount of cocaine,

in violation of Title ___21; 18___ United States Code, Section(s) ___963, 952(a); and 2___ .

I further state that I am a(n) ___Special Agent of the DEA___ and that this complaint is based on the following
Official Title

facts:

SEE ATTACHED AFFIDAVIT

Continued on the attached sheet and made a part hereof: ☒ Yes ☐ No

DEA S/A SHARON E. LINDSKOOG
Signature of Complainant

Sworn to before me and subscribed in my presence,

6-23-00 at Ft. Lauderdale, Florida
Date                                               City and State

LURANA S. SNOW,
UNITED STATES MAGISTRATE JUDGE                     Lurana S. Snow
Name & Title of Judicial Officer                   Signature of Judicial Officer

This form was electronically produced by Elite Federal Forms, Inc.

### AFFIDAVIT

I, Sharon E. Lindskoog, being duly sworn, hereby deposes and states:

1. I have been a Special Agent with the Drug Enforcement Administration (DEA) for approximately four (4) months. As a Special Agent with the Drug Enforcement Administration, I attended the DEA Academy in Quantico, Virginia and received training involving the distribution of controlled substances and related crimes. Prior to becoming a DEA Special Agent, I worked for DEA's Office of Congressional and Public Affairs at the DEA Headquarters in Washington, D.C. for approximately three and half (3 ½) years.

2. This Affidavit is based upon my personal knowledge and upon information provided to me by other law enforcement personnel and a DEA confidential source hereafter identified as CS involved in this investigation. I have personally participated in this investigation and, because of my personal participation and reports made by other law enforcement personnel, I am familiar with the facts and circumstance known to me. Only those facts and circumstances that I believe are sufficient to establish probable cause are contained herein.

3. On or about May 11, 2000, the CS arrived in Freeport, Bahamas aboard his sailing vessel. Upon arrival in Freeport, the CS contacted via telephone an individual known to the CS as Andrew Thompson. Thompson resides in Nassau, Bahamas. The CS told Thompson that the CS was in Freeport and he (the CS) needed to make some money (trafficking drugs). Thompson, according to the CS, said he would send someone to meet the CS.

4. Within several days, an individual identified as TROY BROWN arrived at the

1

sailing vessel of the CS. The CS did not previously know BROWN. BROWN introduced himself to the CS by telling the CS he had been sent to meet him by Thompson. According to the CS, BROWN told the CS that he has previously been involved in the importation of cocaine from the Bahamas to Florida. BROWN told the CS that he was paid two thousand dollars ($2000.00) a kilogram once the cocaine was delivered to the recipients in the United States. By the conclusion of the meeting, BROWN agreed to find someone with a shipment of cocaine that the CS could smuggle into the U.S. BROWN and the CS would equally divide the two thousand dollars ($2,000.00) per kilogram fee received for transporting the cocaine from the Bahamas to the United States.

5.    On June 14, 2000, at approximately 8:00 a.m., BROWN arrived at the sailing vessel of the CS in Freeport, Bahamas. BROWN, according to the CS, was on a water vessel and was with another unidentified individual. BROWN told the CS said he had twenty (20) kilograms of cocaine on the water vessel that he wanted the CS to smuggle into Fort Lauderdale, Florida. The CS told BROWN that the CS would prefer a larger shipment. BROWN told the CS that the twenty (20) kilograms would be a "test" and, if all goes well, a larger shipment would follow. BROWN and the CS agreed that the CS would take delivery of the cocaine at approximately 5:00 p.m.

6.    Before the June 14, 2000 5:00 p.m. meeting, agents of the DEA Freeport Resident Office, Nassau Country Office and the Royal Bahamas Police Force established surveillance in and around the vicinity of the CS' sailing vessel. At approximately 6:20 p.m., Troy BROWN was observed by agents proceeding toward the CS' sailing vessel on a water vessel. BROWN arrived at the the CS' boat and assisted the CS in moving a

toolbox that covered a compartment where the cocaine was to be stored. BROWN obtained two (2) black duffel bags from the water vessel and proceeded into the cabin of the sailing vessel with the CS. BROWN and the CS placed the black duffle bags into said compartment and the toolbox was replaced. BROWN subsequently departed on the water vessel and was observed by the surveillance agents leaving the vicinity of the sailing vessel. This meeting was recorded as the vessel was previously outfitted with video and audio recording equipment by DEA.

7.   On June 14, 2000, at approximately 7:35 p.m., agents met with the CS and recovered the two duffle bags that contained nineteen (19) kilograms of cocaine. Agents photographed the evidence and searched the vessel of the CS for any additional contraband with negative results. After the delivery of the cocaine, the cocaine was transported by DEA and the Royal Bahamas Police Force to Nassau, Bahamas then eventually to Miami, Florida.

8.   On June 19, 2000 through June 22, 2000, telephone conversations occurred between the CS, BROWN, and an individual who said his name was "Pablo," later identified as Paul FERGUSON. During these telephone conversations the CS, BROWN and FERGUSON discussed the delivery of the "packages" (cocaine) to BROWN and FERGUSON. All of these telephone conversations were recorded.

9.   On June 22, 2000, at approximately 5:45 p.m., the CS telephoned BROWN. During this recorded telephone conversation, the CS told BROWN to meet the CS at the Arbys restaurant located on SE 17th Street in Fort Lauderdale, Broward County, Florida. At approximately 6:00 p.m. that same day, agents conducting surveillance observed the

3

arrival of a Dodge Intrepid vehicle at the Arbys driven by BROWN with FERGUSON seated in the front passenger seat. A brief conversation ensued between the CS and BROWN in the presence of FERGUSON about the payment owed to the CS for the importation of the cocaine. The CS told BROWN and FERGUSON that the cocaine was inside an undercover DEA Lincoln Continental. BROWN repositioned the Dodge Intrepid and FERGUSON exited said vehicle and was instructed by the CS to open the passenger side rear door of the Lincoln Continental to obtain one duffle bag containing sham kilograms of cocaine. FERGUSON opened the car door and obtained the duffle bag containing the sham kilograms of cocaine. FERGUSON walked away from the Lincoln Continental to the rear of the Intrepid and attempted to open its trunk. Agents then effected the arrest of BROWN and FERGUSON.

10. After the arrest of BROWN, BROWN was read his Miranda rights and waived the same. BROWN said that he delivered cocaine to the CS in Freeport and traveled to Florida to take delivery of the cocaine from the CS. BROWN said that he received the cocaine from an individual known to him as "Papa" in Freeport, Bahamas. BROWN acknowledged that he spoke to the CS on the telephone the days preceding his arrest regarding the delivery of the cocaine. BROWN stated, upon delivery of the cocaine from the CS, that he and FERGUSON were to deliver the cocaine to unidentified people in Florida and that he was to be paid. BROWN said that he planned to then would pay the CS the promised one thousand dollars ($1000.00) per kilogram of cocaine he had helped import.

11. After the arrest of FERGUSON, FERGUSON was read his Miranda rights and waived the same. FERGUSON said he traveled to Ft. Lauderdale with Troy BROWN on Laker Airlines and was to pick-up parts for BROWN. FERGUSON said that on or about Tuesday (June 20, 2000), BROWN told him that they were going to pick up drugs from the CS. FERGUSON said he knew it was cocaine because BROWN and the CS referred the drugs as "pieces" and he knows "pieces" is a code word for packages of cocaine. FERGUSON told the interviewing agents that he spoke to the CS on the telephone regarding picking up the cocaine from the CS, but the CS told him that he would only deliver the cocaine to Troy BROWN. FERGUSON also said that he knew that the amount of drugs involved nineteen (19) or twenty (20) packages as he discussed the quantity with BROWN and the CS. Additionally, FERGUSON acknowledged that he traveled on June 22, 2000 with BROWN to met the CS to pick up the cocaine. BROWN told him to be the look out, which FERGUSON said he understood this to mean watch for the police.

FURTHER AFFIANT SAYETH NAUGHT.

Sharon E. Lindskoog, Special Agent
Drug Enforcement Administration

Sworn to and subscribed before me
this 23rd day of June 2000.

LURANA S. SNOW
UNITED STATES MAGISTRATE JUDGE